T.C. Memo. 1996-479


UNITED STATES TAX COURT



MIRIAM LAWRENCE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


JOSEPH AND MARGARET ABRAHAM, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  4263-92, 4278-92.        Filed October 23, 1996.


Towner S. Leeper and John E. Leeper, for petitioners.

Gerald L. Brantley, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These consolidated cases were assigned to Special Trial Judge Lewis R. Carluzzo pursuant to the provisions

of section 7443A(b)(4) and Rules 180, 181 and 183.[1]  The Court
agrees with and adopts the Special Trial Judge's opinion, which
is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

CARLUZZO, Special Trial Judge:  These consolidated cases are
before the Court on petitioners' motions for awards of reasonable
administrative and litigation costs, pursuant to section 7430.

A hearing was conducted on petitioners' motions in Houston,
Texas.  The following witnesses testified at the hearing:  Miriam
Lawrence, petitioner in docket No. 4263-92; Alfonso Red, the
revenue agent who conducted the relevant examinations; Sharon L.
Haddad, a certified public accountant retained by petitioners
after the cases were docketed; and Gene Hill, the Appeals officer
responsible for settling the cases.  In addition, petitioners'
attorneys in these cases testified with respect to the extent and
value of the services they rendered.  See Rule 201(a); rule
3.7(a)(2), Model Rules of Professional Conduct of the American
Bar Association.

---

[1]Unless otherwise indicated, section references are to the
Internal Revenue Code as amended and in effect for the relevant
period.  References to sec. 7430 are to the version in effect as
amended by sec. 6239(d) of the Technical and Miscellaneous
Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3743.  Unless
otherwise indicated, all Rule references are to the Tax Court
Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits attached thereto are incorporated herein. Joseph Abraham and Margaret Abraham are husband and wife. At the time when the petitions were filed in these cases all of petitioners resided in El Paso, Texas.

Joseph Abraham (Abraham) was an attorney at law who practiced and maintained his law offices in El Paso, Texas. Miriam Lawrence (Lawrence) was his executive secretary and office manager. She had been employed by him from July of 1969 until February of 1993. During the years 1986 and 1987, Lawrence was also engaged in a real estate business and some form of home-based clothing and jewelry sales business.

Revenue Agent Alfonso Red (Agent Red), conducted an examination of the Abrahams' 1987 joint Federal income tax return. He also examined Lawrence's 1986 and 1987 Federal income tax returns. In the course of his examinations, among other things, Agent Red reviewed bank statements relating to numerous bank accounts maintained by Abraham and bank statements and canceled checks of several bank accounts maintained by Lawrence. He discovered that substantial funds were being withdrawn from bank accounts maintained by Abraham and deposited into bank accounts maintained by Lawrence, and vice versa.

Using the bank deposits analysis indirect method of determining income, Agent Red concluded that Lawrence understated her income for the years 1986 and 1987.  Agent Red also concluded that many of the deposits made into Abraham's bank accounts from checks drawn on one of Lawrence's bank accounts represented income to him.  The major adjustments (the omitted income adjustments)[2] in the notices of deficiency were made in accordance with the conclusions drawn by Agent Red as a result of his reviews of the various bank accounts maintained by either Abraham or Lawrence.  Because petitioners focused on these adjustments in connection with the motions here under consideration, we do likewise.

I. Federal Income Tax Returns

None of the relevant Federal income tax returns were placed in the record.  However, from other evidence presented we have a limited understanding of what information was contained on petitioners' returns.

A. Miriam Lawrence

Lawrence untimely filed her 1986 Federal income tax return in October of 1988.  She reported her salary from her employment

---

[2]In the notice of deficiency pertaining to Lawrence the adjustment is entitled "Income".  In the Abrahams' notice of deficiency the adjustment is entitled "Gross receipts".

with Abraham in the amount of $39,969.  In addition, on a Schedule C she reported $3,453 in gross receipts from her other businesses.  After various deductions she reported taxable income of $8,193 for the year 1986.

Her 1987 Federal income tax return was apparently timely filed.  For that year she reported $39,847 in salary from her employment with Abraham, and on a Schedule C, $8,743 in gross receipts from her other businesses.  After various deductions she reported taxable income of $18,617 for the year 1987.

As best we can tell from the record, there was nothing on Lawrence's returns that indicated that she was indebted to Abraham during the years 1986 and 1987.

B. Joseph and Margaret Abraham

On a Schedule C included with the Abrahams' 1987 Federal income tax return, Abraham reported gross receipts in the amount of $1,344,364 from his law practice.  Although there is some information with respect to specific expenses deducted on the Schedule C, the record does not reveal whether petitioners reported a net profit or loss from Abraham's practice of law.  We are unsure as to the extent, nature, or source of other income that might have been reported on their return.  It appears that the Abrahams elected to itemize deductions for the year 1987.  On

their 1987 return they reported taxable income in the amount of $36,338.

As best we can tell from the record, there is nothing on the Abrahams' return that indicates that Abraham was a creditor of Lawrence during the year 1987.

II. Bank Accounts and Business Records

A. Miriam Lawrence

During the year 1986 Lawrence maintained at least two checking accounts. During that year she made deposits into these accounts in excess of $743,000. Of this amount, $438,940 consisted of checks drawn on one of the accounts maintained by Abraham, and $24,260 consisted of currency deposits of $500 or more. She wrote checks totaling over $790,000 on these two accounts. Included in this amount were in excess of $150,000 in checks written to Abraham, over $144,000 in checks written to Texas National Bank; almost $75,000 in checks written to American Finance Co.; over $14,000 in checks written for furniture and fixtures; over $26,000 in checks written to department stores; over $23,000 in checks written to American Express; a check or checks in the amount of $29,449.50 written to the Internal Revenue Service; $13,063.07 in checks written to El Paso Country Club; and over $6,500 in checks written for jewelry.

During the year 1987 Lawrence maintained at least four checking accounts and one savings account. For the year 1987 she made deposits into these accounts in excess of $2,500,000. Of this amount, in excess of $1,900,000 consisted of checks drawn on one of the accounts maintained by Abraham, and $189,271 consisted of currency deposits of $500 or more. She wrote checks totaling over $2,500,000 on these accounts. Included in this amount were in excess of $388,000 in checks written to Abraham, over $370,000 in checks written to Texas National Bank; over $116,000 in checks written to Continental National Bank; over $150,000 in checks written to American Finance Co.; over $40,000 in checks written for furniture and fixtures; over $65,000 in checks written to department stores; over $74,000 in checks written to American Express; a check or checks in the amount of $3,193 written to the Internal Revenue Service; $42,650 in checks written for furs; over $18,000 in checks written for jewelry; and $8,500 in checks made payable to herself.

In both years, apparently some of the checks written to banks were for the purchase of cashier's checks.

Other than the bank statements that she kept with respect to her various accounts, Lawrence did not maintain any books or records that recorded her income and deductions for the years

1986 and 1987, with respect to either her employment with Abraham or her other businesses.

B. Joseph and Margaret Abraham

There is no information in the record with respect to any personal bank accounts maintained by the Abrahams during 1987.

In connection with his law practice and other business or investment interests, Abraham maintained between 5 and 13 bank accounts. During the year 1987, checks drawn on an account of Lawrence's and cashier's checks purchased with funds from one of her accounts totaling more than $1,200,000 were deposited into the accounts of Abraham.

For each of at least five of the accounts, Abraham maintained a general ledger. In connection with his law practice, he kept various other types of books and records, including a cash receipts journal and something referred to by Lawrence as a "daily cash requirements" journal.

III. Respondent's Examinations

The examination of Lawrence's 1986 Federal income tax return started in February of 1989. Initially it was assigned to Revenue Agent Frances Thicke. On July 23, 1990, the examination was transferred to Agent Red. After reviewing the case file, Agent Red discovered that several bank statements were missing. He was also concerned that the transactions reflected on the bank

statements that he did have appeared to be unusually large in relation to the amount of income reported on Lawrence's 1986 return.

After Agent Red was assigned Lawrence's examination, it was expanded to include the year 1987, and she was duly notified through her then representative. On August 14, 1990, at his first meeting with Lawrence's representative, Agent Red expressed his concern over the transactions occurring between Lawrence and Abraham. Agent Red was told that the transactions reflected on the bank statements were believed by the representative to be loans and repayments between the two individuals. At this meeting, Agent Red issued an information document request (IDR) to Lawrence's representative requesting certain missing bank statements; all books and records relating to Lawrence's business activities; a list of all her bank accounts for the years 1986 and 1987; and other information. Lawrence did not comply with Agent Red's request for the missing bank statements and list of bank accounts.

Because of the relationship between Lawrence and Abraham, Agent Red was assigned the examination of the Abrahams' 1987 Federal income tax return. On July 23, 1990, Agent Red mailed an initial appointment letter to the Abrahams along with an IDR requesting among other things certain books and records relating

to Abraham's law offices; information with respect to the sale of certain property; information relating to certain investments; and "[records] of all loans and repayments."

In Agent Red's letter to the Abrahams, he requested an initial conference date of August 10, 1990; however, due to the unavailability of the Abrahams' attorney, Towner Leeper, the meeting was postponed until September 5, 1990. On September 4, 1990, Agent Red was advised in a telephone conference with Towner Leeper that Abraham had been examined for prior years, similar issues had been raised, and the matter had ultimately been settled, mostly by concession on the Government's part. Towner Leeper wanted Agent Red to review the materials of the prior examination before Agent Red started the current examination. They scheduled a meeting for the next day. Prior to the meeting, Towner Leeper telephoned Agent Red and advised him that he was having difficulty locating the file from the prior examination and that he did not want to meet until he found the file. Agent Red indicated that he was going to begin the examination by visiting Abraham's law offices the next day. Agent Red was advised by Towner Leeper that if he did so he would be "physically removed from the premises." Apparently Agent Red waited for the information from Towner Leeper. On October 23,

1990, Towner Leeper met with Agent Red and provided certain records relating to the prior examination of Abraham.

Due to other responsibilities and the delays he encountered in attempting to obtain information with respect to Lawrence's examination, Agent Red did not work on petitioners' examinations from late October 1990, through January of 1991.

On February 13, 1991, Agent Red met with Towner Leeper and Lawrence. Lawrence was present at this meeting in her capacity as Abraham's office manager. Towner Leeper did not represent her at this time with respect to her own examination. At this meeting Agent Red was provided with some of the records that he had requested in his July 23, 1990, IDR to the Abrahams. He still had not received the information he requested in the IDR issued to Lawrence on August 14, 1990.

On March 15, 1991, Agent Red issued a second IDR to the Abrahams. He again asked for the daily log of cash receipts and the cash receipts journal. He also asked for an "explanation of the large [number] of transfers between accounts." In response to the IDR of March 15, 1991, Agent Red met with Towner Leeper and Lawrence on March 26, 1991. Agent Red was not provided with the information he had requested in the IDR.

On May 28, 1991, in a letter to the respective representatives of petitioners, Agent Red requested that the

limitations periods relating to the examinations be extended for a period of 1 year until October of 1992. Petitioners agreed to extend the periods only until December 31, 1991, an extension of 2 months.

On June 3, 1991, Agent Red issued another IDR to Lawrence requesting the same information that had been requested in the August 14, 1990, IDR, as well as additional information on other subsequently discovered bank accounts.

Because the IDR's issued to Lawrence were not fully complied with, Agent Red issued summonses to various banks in July of 1991 seeking certain of the information that Lawrence failed to provide. After receiving some records directly from Lawrence and some of the missing bank statements from the banks, Agent Red prepared check and deposit spreadsheets for each of Lawrence's bank accounts. On August 27, 1991, he issued yet another IDR to Lawrence and attached copies of the spreadsheets he had prepared from the bank records. He requested that Lawrence identify the source of each deposit listed on the spreadsheets and explain the purpose of the checks written on the accounts. The response date for the IDR was September 12, 1991. On September 11, 1991, Lawrence telephoned Agent Red and requested a 1-week extension, to which he agreed.

While waiting for the information on Lawrence's examination, on September 16, 1991, Agent Red issued an IDR to the Abrahams and provided a copy of it to Towner Leeper. Among other things, the IDR specifically requested records and information with respect to "loans made by taxpayers to all third parties (including Miriam Lawrence) in 1987". With respect to many of Abraham's bank accounts reviewed by Agent Red, the IDR requested an explanation as to "why are a large amount of transfers being made from and to this account from other accounts?" Once again, Agent Red requested the daily logs of cash receipts and the cash receipts journals for Abraham's law practice. The response date for this IDR was September 27, 1991.

Also on September 16, 1991, Lawrence telephoned Agent Red and asked that the response date for the August 27, 1991, IDR issued to her be extended once again. This time she requested that it be extended until October 15, 1991. In addition, she indicated that she needed to have her records returned to her so that she could respond. In response to her request, Agent Red asked that she extend the period of limitations until March 15, 1992. She declined to do so. On September 24, 1991, Lawrence retrieved what records she had provided to Agent Red.

On September 27, 1991, the response date for the September 16, 1991, IDR issued to the Abrahams, Agent Red telephoned Towner

Leeper.  Towner Leeper advised Agent Red that the information was being gathered and would be provided by October 31, 1991.

Given the lack of cooperation that Agent Red was experiencing in the examinations of petitioners, after consulting with his group manager, he decided to issue summonses to Lawrence and to the Abrahams.  Agent Red had previously issued summonses in about 5 percent of his cases.   The summonses were issued on October 1, 1991.  In each case, the summons requested information relating to loans and repayments.

The summons issued to Lawrence was returnable on October 15, 1991.  On that date she appeared at the summons conference with Towner Leeper, who now represented her.  At the conference Lawrence either refused, or failed to provide, any explanation with respect to the checks she had written on, or deposited in, her accounts.  With respect to any loans between her and Abraham, she indicated that the only documentation for the loans consisted of the canceled checks between the two.  She did not know the outstanding balance of her indebtedness to Abraham, and with respect to any interest that he charged her, she indicated that she was charged "the going rate at the time of the loans."

The conference with respect to the summons issued to the Abrahams took place on October 16, 1991.  Abraham appeared together with his representative, Towner Leeper.  The conference

started at 9 a.m. and Agent Red was advised that Abraham had to leave by 10 a.m. for a court appearance. Abraham failed to respond to many of the questions put to him at the summons conference. Abraham stated that he had outstanding loans to Lawrence during 1987. He further stated that he did not know the terms of the loans, other than that the interest he charged her was minimal.

IV. The Notices of Deficiency

On December 26, 1991, respondent issued a notice of deficiency to Lawrence determining deficiencies in her 1986 and 1987 Federal income taxes in the amounts of $273,222 and $793,894, respectively. Respondent also determined that she was liable for various additions to tax for those years. The deficiencies resulted from the following adjustments to her income:

| Description | 1986 | 1987 |
|---|---|---|
| Income | $563,635 | $2,065,546 |
| Contract labor | 1,636 | |

The notice of deficiency with respect to the Abrahams was issued by respondent on December 31, 1991, in which a deficiency in their 1987 Federal income tax in the amount of $908,168 was determined. Respondent also determined that they were liable for various additions to tax for the year in issue.

The deficiency resulted from the following adjustments to their income:

| Description | 1987 |
| --- | --- |
| Gross receipts | $1,661,551 |
| Interest expense-Sch. C | 116,321 |
| Schedule C expenses: attorney | 225,054 |
| Schedule C expenses: La Posta | 37,286 |
| Schedule E: Fall Mansion | 40,202 |
| Capital gains and losses | 407,576 |
| Itemized deductions | (11,351) |

The bases for the adjustments made in the notices of deficiency were the conclusions formed by Agent Red as a result of his examinations.

V.  The Docketed Cases

The petitions were filed in these cases on February 27, 1992.  In each case petitioners assigned error to all of the adjustments made in the notices of deficiency.

With respect to the omitted income adjustment, in her petition Lawrence alleged that "the revenue agent used the bank deposit method to determine that petitioner had realized additional income without any inquiry of petitioner to identify the nature of the deposits."  Likewise, the Abrahams, in an amendment to their petition, alleged that the "unreported income was determined under the bank deposit plus cash expenditure method without inquiry into non-taxable transfers and loans, no

consideration of beginning cash, nor any likely source of income."

The petitions were filed on behalf of petitioners by Towner Leeper, who remains counsel of record in these cases.

In connection with the adjustments resulting from Agent Red's review of the various bank accounts, the positions taken by respondent in her answers are the positions that respondent took in the notices of deficiency; that is, unexplained bank deposits represent taxable income to the depositor.

After the cases were docketed, they were assigned to Appeals Officer Gene Hill. Sharon Haddad (Haddad), a certified public accountant, was hired by petitioners in connection with Appeals Officer Hill's consideration of the cases. Petitioners requested that the Court continue the cases from a scheduled trial session so that Haddad would have additional time to complete an analysis of Agent Red's examination prior to meeting with Appeals Officer Hill. Haddad eventually completed her analysis and prepared several reports that focused on the adjustments made to the Abrahams' income. Her analysis and reports were limited to the year 1987. One of the reports (the transfer report) that she prepared contained a side-by-side comparison of the numerous bank account transactions between Abraham and Lawrence. The transfer report did little more than reproduce certain of Abraham's

records, and in a different format, present schedules prepared by Agent Red. Haddad testified to this effect at the hearing.

In preparing the transfer report Haddad relied upon the representations made to her by petitioners, or on their behalf by their attorneys, that the questioned deposits reflected on the various bank statements did not represent taxable income to either Abraham or Lawrence. Haddad also had access to certain records of Abraham's law practice that had not been provided to Agent Red. Specifically she was given what were referred to by Lawrence as "daily cash requirements" journals.

On August 5, 1993, Appeals Officer Hill was presented with the reports prepared by Haddad. Based upon his review of these reports, on August 26, 1993, he advised petitioners' representatives of respondent's concession of the omitted income and other adjustments. On October 13, 1993, the Court entered stipulated decision documents in these cases. In connection with petitioners' motions here under consideration, the stipulated decisions were vacated and filed as stipulations of settlement on November 19, 1993.

OPINION

Generally, section 7430 provides that in order to be entitled to an award for reasonable administrative and litigation costs the claimant must be a "prevailing party". Sec. 7430(a). In order to be considered a prevailing party, the claimant must

establish that: (1) The position of the United States in the proceeding was not substantially justified; (2) the claimant prevailed with respect to the amount in controversy or with respect to the most significant issue presented; and (3) the claimant met the net worth requirements of 28 U.S.C. sec. 2412(d)(2)(B) on the date the petition was filed. In addition to the above, the claimant must also establish that all administrative remedies have been exhausted insofar as litigation costs are concerned; that the claimant has not unreasonably protracted the proceedings; and that the amount of costs claimed is reasonable. Sec. 7430(b)(1), (4). The moving party bears the burden of proof with respect to each of the above-listed elements. Rule 232(e).

Respondent objects to petitioners' motions on several grounds. First, she argues that her position was substantially justified. Secondly, she argues that petitioners have unreasonably protracted the proceedings. Thirdly, she argues that Abraham has failed to satisfy the net worth requirements. Fourthly, she argues that a fee arrangement between counsel and petitioners precludes any award under section 7430. Lastly, respondent argues that the amounts of costs and attorney's fees that petitioners are seeking are not reasonable.

I. The Substantial Justification of Respondent's Position

Until her Appeals officer conceded the cases in response to information not previously provided to the revenue agent, respondent's position in this matter was that the unexplained bank deposits to the accounts of Lawrence and Abraham represented taxable income to each as computed in the notices of deficiency.

Whether respondent's position is substantially justified is a question of fact.  We resolve such issues by the application of a reasonableness standard.  See Pierce v. Underwood, 487 U.S. 552 (1988) (construing similar language in the Equal Access to Justice Act, 28 U.S.C. sec. 2412 (1988)).  In considering the reasonableness of respondent's position, we take into account what she knew at the time that she took the position based on the information available to her at that time.  See Rutana v. Commissioner, 88 T.C. 1329, 1334 (1987).

Petitioners claim that, even without their cooperation, Agent Red had the obligation to go further in his examinations. They claim that Haddad had no more information than Agent Red did and that she was able to satisfy respondent's Appeals officer that the deposits in question did not represent taxable income to either Abraham or Lawrence.  Respondent argues that Agent Red was entitled to ask for and receive explanations with respect to the

many transactions reflected on the bank statements.  According to respondent, petitioners had an obligation to cooperate with Agent Red during the course of the examinations, and their failure to do so resulted in the adjustments made in the notices of deficiency.

We agree with respondent.  Initially we note that petitioners' statements in the petitions alleging that Agent Red never asked for an explanation with respect to the deposits in question are patently frivolous.  The IDR's served upon petitioners and their representatives asked for such an explanation in clear terms in the early stages of the examinations.  Likewise, during the summons conferences, which were attended by at least one counsel of record in these cases, petitioners were specifically questioned about the circumstances surrounding any loans among them.[3]  To the extent that any explanations were given, for example, as to the amount of interest charged on loans, the explanations were inconsistent. Furthermore, in the Abrahams' case, reference in the amendment to petition to Agent Red's failure to take into account "non-taxable

---

[3]We cannot help but question the bona fides of petitioners' allegations on this point due to the fact that counsel was present at the summons conferences and aware of the issuance and contents of the various IDR's.  See Rule 33.

bank transfers" and "beginning cash" is erroneous in part and irrelevant in part. Agent Red did not include in Abraham's income what were identified in his records as bank transfers, and because the omitted income adjustment was based upon specific items, and not upon a net worth analysis, there was no need to consider "beginning cash". In many respects, we view petitioners' motions here under consideration as having no more merit than the above-mentioned allegations made in their respective pleadings.

Petitioners' contention that Agent Red had access to the same information that Haddad had access to is also meritless. Not only did Haddad prepare her reports with petitioners' cooperation, she had been given the "daily cash requirements" journals that were withheld from Agent Red.

There is a long line of authority for the proposition that unexplained bank deposits are presumptively from taxable sources. See, e.g., Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964); DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Agent Red was entitled to rely upon such a presumption in the absence of any reasonable explanation to the contrary. We do not view the tentative explanation given to Agent Red in August of 1990 by Lawrence's then representative, or

the statements made by Lawrence and Abraham at the summons conferences, to constitute reasonable explanations, particularly in view of the extent and magnitude of the transactions, the inconsistent statements made concerning interest, and the complete lack of any corroborating documentation on the point.

After listening to 2 days of testimony and reviewing literally thousands of pages of exhibits, the Court still has not heard a reasonable explanation for the transactions occurring between Abraham and Lawrence. If the transactions represented loans between the two, the loans were not reflected as such on any documents.

The fact that Appeals Officer Hill accepted Haddad's transfer report as support that neither Abraham nor Lawrence realized taxable income from the various bank transactions occurring between the two is certainly not conclusive that Agent Red's adjustments and the position of respondent that resulted therefrom were unreasonable. We have many times stated that the Commissioner's concession of an issue does not necessarily lead to a finding that her position was not substantially justified. See, e.g., Wilfong v. United States, 991 F.2d 359, 364 (7th Cir. 1993); Sokol v. Commissioner, 92 T.C. 760, 765 (1989); Wasie v. Commissioner, 86 T.C. 962, 968-969 (1986). Furthermore, in this

case, what the Appeals officer considered to be critical information was not provided to Agent Red. Haddad's reports were not prepared until after the close of Agent Red's examinations.

Petitioners contend that a similar issue, involving items of omitted income, was raised and conceded by the Government in a prior examination of Abraham's income tax return for an earlier year. Petitioners argue that it was unreasonable for respondent to once again pursue the issue. There is nothing in the record, however, that indicates the level of Abraham's cooperation during a prior examination or what explanations were provided. In any event, our view of the significance of a prior examination differs from petitioners'. We note that in his July 23, 1991, initial appointment letter to the Abrahams, Agent Red acknowledged that it might be unproductive to examine matters that had been previously considered and resolved. We do not view unexplained bank deposits to fit within the category of previously examined matters referred to in that letter.

Petitioners' attack on the reasonableness of respondent's position is severely undermined by their failure to cooperate with Agent Red during the examinations. Cf. <u>Inman v. Commissioner</u>, T.C. Memo. 1996-16. Agent Red requested, and was entitled to receive, explanations for the transactions reflected

on the various bank statements that he reviewed during the course of petitioners' examinations. It was petitioners' obligation to provide the explanations.

In view of the amounts involved in the questioned transactions and petitioners' failure to cooperate, Agent Red acted reasonably under the circumstances. With the period of limitations about to expire, he concluded his examinations and adjusted petitioners' incomes based upon the information available to him at the time.

Accordingly, we hold that respondent's positions in the administrative and litigation proceedings were substantially justified.

II. Respondent's Other Objections to Petitioners' Motions

Because the requirements of section 7430 are in the conjunctive, Minahan v. Commissioner, 88 T.C. 492, 497 (1987), our holding that respondent's position was substantially justified operates in and of itself to deny petitioners' motions. Consequently, we need not address respondent's other objections to the motions.

To reflect the foregoing,

Appropriate orders and decisions will be entered.